The next case this morning is 18-1969 United States v. Carpentino. Okay, Mr. Hennessy. Good morning and may it please the courts. Robert Hennessy on behalf of the appellant Kirk Carpentino and with the court's permission I'd like to reserve also two minutes for rebuttal arguments. Yes, you may have. An issue in this case is this is an appeal of the district court's denial of a motion to suppress. The issue is whether that denial was an error. The motion to suppress concerns certain inculpatory statements made by Mr. Carpentino during his uncounseled custodial interrogation by the Vermont State Police. Just to set the stage with a couple of facts that I think frame the legal issues in this is that these statements at issue were obtained during a second interrogation on the day a little more than an hour before this second interrogation commenced. Mr. Carpentino had ended an earlier interrogation by unambiguously invoking his right to counsel. At that point Mr. Carpentino was returned to the holding cell and the trial judge made findings that on the way back to the cell Mr. Carpentino asked one of the interrogators, Sergeant McCoy, if he could make a call to his lawyer and Sergeant McCoy said yes, you can make a call to your lawyer. However, no call was ever provided to Mr. Carpentino. Some 40 minutes later Mr. Carpentino, through a police intermediary, asked to speak. Just, I'm curious, whose responsibility was it to get him to a phone to call a lawyer? Do we know? Well, he didn't have a constitutional right to a lawyer, but in terms of how it worked within the police station it's unclear. Vermont law actually provides a state right to contact an attorney and I believe Vermont law, of course, doesn't apply in this case, in this situation but it places the obligation on the police to arrange to contact counsel in these circumstances. As opposed to the jailers? I'm sorry, the jailers in this case were the police. He was being held at a Vermont State Police facility. So what are you doing with that fact? How are you using that? What argument of yours is that further, that he said he wanted to make a call, he was told he could make a call, he never had a chance to make the call? What issue does that advance for you? Well, frankly, I think it advances three arguments that I have for why the denial of motion to suppress was erroneous in this case. I'll start with the first. Because Mr. Carpentino unambiguously evoked his right to counsel, the threshold question and the first question for the court is whether his subsequent communications with police can reasonably interpret to events a desire to open up a more generalized discussion relating directly or indirectly to the investigation, which is of course Edwards' initiation requirement. Now, in terms of what actually happened, Mr. Carpentino signals to his jailers that he would like to speak to his interrogators again. He's brought back to the interrogation room and what follows, and I think this is where the fact that he had requested and been denied access to counsel, or a phone call to counsel previously, comes into play. Because the first thing that Mr. Carpentino says upon coming in is a case-specific inquiry. He says, how much would the maximum time for something be for this, essentially? And then, and this is the important part, is that the trooper, excuse me, the sergeant responds to him at that point. He has a sort of a clarifying inquiry that says, now you've come to us saying, hey, I want to talk to you again, correct? And Mr. Carpentino at that point responds explicitly, yes, because one of the things that the officer said once I was done talking with you was that it was up to you if I could have a phone call to my lawyer. And my first argument is that, you know, although this court and the federal court generally have applied a pretty broad interpretation of initiation in this context and has allowed fairly innocuous questions to support the inference of an intent to engage in a broader conversation about the case, whatever, you know, and I think that his first question would support that inference. You know, what is the maximum time for something like this? In isolation. But then when the officer immediately asks what his reason for being back in that room was and he explicitly tells him, because I want to make a phone call to my lawyer, I think that that whatever inference would have been created by the first statement does not survive that. It pretty quickly says, I want my lawyer to know who I am. Well, that is in the next exchange. You know, in terms of the initiation, my argument is that at the moment the police ask the clarifying inquiry, you know, why are you back in this room, is it correct that you're saying, I want to talk to you again, and he says yes because I was told I had to come to you to talk to my lawyer, that should have ended it in terms of the initiation inquiry. But, you know, it's not crystal clear, and you've got two questions, and two statements by the accused that generally point in different directions. And don't we owe some deference to Judge Barbadoro's drawing of inferences and his attempt to come to the best resolution of those apparently conflicting statements? Well, my position or my understanding of the law is that Judge Barbadoro is accorded significant deference with regard to his finding of the facts, which in this case is the words that were spoken by the different partners. Judge Barbadoro says in his findings that the facts are essentially uncontested because they're all recorded. We're working off recordings of these things. I would say in this context, you know, this court would review the legal question of whether these communications between the parties constitute initiation. If these communications as a matter of law dictate one result or another, our review is clearly de novo. But if they leave the situation ambiguous and the hearing judge resolves that ambiguity in favor of one party or the other by drawing a permissible, rational inference, don't we owe deference to that inference? Well, insofar as this might be sort of a mixed question of fact and law, there is some deference accorded. You know, Mr. Carpenter's position is that although these two statements point in opposite directions, they don't actually create an ambiguity on this point for the simple fact that how much was the maximum time something for this would be, you know, the initial question, supports an inference of why he was there. His statement, I'm here because I was told that I had to talk to you so I could use a telephone call, doesn't rely on an inference. That's him stating on the record why he is in that room. But your position, you want us to adopt the position as a matter of law that when he said, this is Carpentino, yeah, because one of the things the officer said that once I was done talking with you was that it was up to you if I could have a phone call to my lawyer, that that is a clear and unambiguous assertion that he wants to talk to his lawyer without any further conversation with the officers. At that time, the conversation should have stopped and all they should have done was make sure that he could make that call. Is that your position? My position, and I want to keep analytically separate the issue of initiation and then whether or not he re-invoked his rights, which is a separate argument that I'm making. I thought that's what you were saying, that that statement, he had re-invoked his right to counsel. I thought that's what you were arguing. What I was arguing was that the communications that occurred at the beginning of this conversation do not meet the test for re-initiation of contact under Edwards. So you want us to look at re-initiation and re-invocation as two separate issues. I do, yes. That's how they're arguing the brief. And although this is an ongoing thing, I think that they're legally analytically distinct. Counsel, just as a factual matter, how long is it between the statement, it's up to you whether I could call my lawyer, and the statement that I want my lawyer to know where I am? I think that they're close in time. There's no gap. The recording is on. The second follows immediately. So he says, the reason I'm here is because I was told that I had to talk to you if I want to talk to my lawyer. And then the trooper does an interesting question. The trooper says, well, what is it you're looking for? Are you here to call your lawyer or do you want to talk to us? And I don't believe there's a long gap. The recording is on file. I can certainly let you know. I don't have the times. But it was part of an ongoing conversation. There are some long pauses in this interaction, but this was not one of them. But we're dealing in seconds here. Yeah, I would say no more than ten seconds. Okay. Yeah. It might make a difference, you know, if there's an ongoing conversation and it's not clear to the police and they're trying to clarify, it's not clear to them that they need to stop and they're trying to clarify what's going on. A five-minute gap might be different than a ten-second gap. Sure. I can understand how factually that might be different. Of course, my argument is that when they specifically ask him why he's here and he specifically responds to him by beginning with the word because, that ambiguity had disappeared from the case. But if I can just move on to the other, what I consider analytically distinct issues. One is the issue of whether or not, assuming that he re-initiated contact, but nevertheless at that point re-invoked his right to counsel, which he had previously revoked less than an hour, about an hour before, when, you know, that very same point in the transcript we were just talking about, when they ask him, you know, why he's here, he's here because he wants to get a lawyer, he needed to speak with his lawyer. And they say, is that what you're looking for? Is it a phone call to your lawyer or do you want to talk to us? And his response is, I kind of need a phone call to my lawyer, too. My argument is that in context, not with stating the word, too, that that's an unambiguous statement that he intends, that he wants to speak with his lawyer. I mean, I think in context we need to look at the fact that he had just invoked his right to counsel. Yeah, but you can't just brush aside that word, too. I mean, that indicates that he obviously, at the very least, had a second reason. Well, I think as the conversation goes on, that, too, is readily explained by the fact that he wants a lawyer and he wants to talk to the police with his lawyer present. Well, that's one interpretation of it, obviously yours, but I don't think it's a necessary interpretation. Well, what Judge Barbadaro found, and I think is a reasonable factual finding, is that by that, the accused meant, I want to talk to my lawyer and I want to talk to you. And that's the point at which the trooper said to him, in effect, you can do one or the other. Tell us what you want to do. And that gets us to the binary choice question, and you've got another argument. Yeah, and I would say that in terms of Judge Barbadaro's interpretation that you're suggesting here, that creates the binary issue, which Miranda says this is not a binary issue. There's no reason that you can't have your lawyer come and also give a statement to the police. It suggests that that's one of the legitimate outcomes. Counsel, haven't we said in our cases that in terms of whether somebody is invoking a right to counsel in light of the custodial interrogation that the defendant finds himself in, it matters what the purpose of wanting to talk to the lawyer. Is it because he wants assistance in dealing with the custodial interrogation, or is it for some other reason? And he does indicate another reason here. It is appropriate for the police to try to understand why he wants to talk to a lawyer. Don't our cases indicate that? If I may respond, my time is up. Yeah, go ahead. Yes, they do. In fact, Judge Barbadaro talks about that. He cites the Grant Chase case out of the circuit that suggests that, you know, although an indication could be clear, it could still be ambiguous as to purpose. So, and I explained this in my brief, but with regard to the Grant Chase case, you know, that was a habeas case. And importantly, that ambiguity existed where there was a pre-Miranda request to call a lawyer, and it was ambiguous as to purpose because I believe it was a defendant telling us, I called the lawyer without explaining why. And in that case itself, it says that a request to talk to a lawyer during the custodial interrogation is far less likely to be ambiguous as to purpose than a pre-interrogation request. And my argument with respect to that is that given that he had not only been interrogated this entire time, he had actually invoked his right to counsel once. And when he invokes or says words that I believe was a re-indication of that right, the idea that he was suddenly, his only purpose was to let someone know he was here and he did not want help with this interrogation, I think, doesn't withstand scrutiny. I have a question. Okay. And it's not coming out of your rebuttal time. You can answer. Fair enough. He had had a prior conviction and had served time for a prior sexual assault. Correct. Did the officers interrogating him know about the prior conviction and his prior experience with the law at the time they were interrogating him? I don't believe the record is clear as to that. I would have to listen back to the recording. There may have been references that the police suggest that he's been here before. They weren't the focus of this argument, so I'd have to look back. All of those recordings are on file with the court. So that's certainly possible. I believe he was a registered sex offender. His conviction was in New Hampshire and he's a Vermont State Police, so there may be a level of separation there, but I'm not entirely positive. If he's had prior experience and he knows his right to counsel and he gives ambiguous statements like this, doesn't that go to what the officers reasonably understood? Well, with respect to his prior experience, those convictions occurred when he was a juvenile, number one, his arrests in those prior cases. There were single events, but certainly prior experience with the criminal justice system is one of the things that you would consider with respect to the voluntariness analysis. Yeah, okay. Thank you. You have your two minutes. Thank you very much, Your Honor. Good morning. May it please the Court. Seth A. Frame for the United States. So I do think that this is a three-party inquiry and the place to begin to think about it is the reinitiation step because that really is a red light, green light beginning to this situation because he did invoke initially, and that does create a red light for the police until the defendant says, I want to talk again. And he does say, I want to talk again, and under Bradshaw, reinitiations allow the police basically to take us back to square one where now the police can attempt to get a Miranda waiver so long as the reason for the initiation is not one of those questions that are incidental to the custodial relationship. In the Bradshaw case from the Supreme Court, they refer to a request for a drink of water or a request to use the phone. So the initial statement that the defendant makes is, can I talk to the officers? He's brought back to the room. The very first question that he asks is, what's the maximum time for something like this? What your brother says that the immediately following statement clarifies that this isn't a reinitiation. But I think that my view of the reinitiation is that that is over. That part of the three-step process that we have to go through to analyze that case, that part is over when his first question is case-related. That doesn't mean they can then just launch into discussions about the case. That means they can begin the process to get a valid Miranda waiver. But that first question does, I think, take us past the Bradshaw question, which is question one. So you would look at his second statement as whether, we'd have to analyze that as whether that statement was a re-invocation of the Supreme Court. Correct. So then we're into the Davis Supreme Court case, which is that an unambiguous invocation of the right to counsel such that the police had to stop at that moment. And I think that Davis is very clear that it has to be unambiguous. And this statement is not an unambiguous statement. It's a statement of, I'm interested in a phone call. And then the troopers do what Davis says is good police practice. At the very end of Davis, Justice O'Connor said, we are not requiring this, but good police practice in the face of ambiguity is to follow up, to ask more questions, to try to clarify. And that is exactly what these troopers did. Are you looking for a phone call or do you want to talk to us again? Then the defendant says, I need a lawyer too. I need to let somebody know that I'm here. That is clarifying in the sense that the reason that the defendant is asking for the lawyer too is to let someone know where he is. Now, the officers actually don't accept that as a complete answer to what he wants to do. They go on for several more pages of transcript here telling him, you have a choice. You don't have to talk to us. You can call a lawyer. And that goes on and on for some time until the defendant does finally decide that he wants to talk. So Judge Barron-Orr called this excellent police practice. And I think that's because what these officers did was take that suggestion in Davis and really go with it and really try to figure out what this defendant wanted to do. Can I go back? Yeah. At the very start of this, he does ask to make a phone call. But he doesn't get to make a phone call. Why not? So the record doesn't say why not. Not that much time had gone by until his decision to want to come back and talk to the officers. So you go put him in a cell before you let him call his lawyer? He was brought back to the holding cell after he invoked. And the record does not indicate that he made a phone call. Yeah, well, that's what I'm raising questions about. Those are the facts. Those are the facts. I don't think. Well, is it the habit that you go put somebody in a jail cell after they've asked to call the lawyer and you delay him calling the lawyer? I can't say whether that's a habit of Vermont State Police. All I can say on this record is 40 minutes went by. Okay, so what's the legal significance of that? Well, I don't think that there is one because he re-initiated contact, had multiple chances to this conversation to say, I want to make a phone call. He re-initiated the contact because he did not get the chance to make the call that he wanted. He made very clear at once that that's, what about that call? That's the first thing he says. Well, that's not the first thing he says. It's right up there. I agree, it's right up there. And so the question is, the first thing he says is something about the case. Then he references the call. Then the officers say, if you want to make the call, you can make the call. Then he says, well, I want to make the call too, but then there's discussion about why he wants to make the call, just to let someone know he's there. And then the officers give him multiple chances to say, I don't want to talk to you, I want to make the call. And he doesn't make that choice, which is clearly given to him several times in this relatively short exchange. The officers are very clear, you're the one in charge here. You can do what you want to do. These are the choices. And he chooses to talk to them. He is an experienced person with law enforcement. He knows that if you say, I don't want to talk, he knows that the point is inevitable. Okay, suppose he had said, I want to call my lawyer. I want to make a call to my lawyer. And they hold him there for the next couple of hours before they let him call. And after two or three hours, he says what he says. Is that a different case than what we have here? Constitutionally, I don't think he has a right to make a call to the lawyer. I don't think he actually has that right under the federal constitution. But he believes he's been told he can do it, and then it turns out that they just don't make it possible for him to do it. I think that all of that could be bound into a Miranda, voluntariness, that argument. That could all be baked into an argument about that. But I think we have to take that fact in conjunction with all these other facts, this conversation, this, you know, maybe better practice would have been to give him the call earlier. But they certainly made clear to him in this discussion, if you drop the ball then, if you want to make that call now, now you can absolutely make that call. And he chooses not to. And I think from a constitutional perspective, that's the important point here. No one, as far as I can tell, has made any attempt to develop the record regarding that 40-minute gap. I mean, we don't know what the reason was why he wasn't given a telephone. We don't know what the physical setup of this Vermont state barracks was. We don't know what the personnel situation was. We just don't know anything except the fact that he asked for a lawyer. They stopped the questioning, put him in the holding cell. Right. And I'll, I mean, I've litigated this below, so I can say that this argument about the initial discussion of the phone call was not part of the arguments that were raised before Judge O'Connell. No, and it's not part of anything that's brief to us, but it's something that's obviously troubling to all three of us. And you can understand why. We understand that a state trooper is not federal law enforcement, but the principal is. And I'm answering as forthrightly as I can that they were, that the defendant was put in the cell for 40 minutes, no phone call was made. He initiated contact. You know, maybe they had 20 other people there all wanting to use the phone. I just don't know. But if it's a sort of deliberate police tactic not to let you have the call for 40 minutes or longer, then that would be very worrisome. Yes, I'd argue. If we had a record in this case of police manipulation, of promising someone something and not giving it to them and making them wait, and that's a police practice and was done for a coercive reason, that definitely could be baked into a Miranda analysis. That's not the record. And the record here... And the claim wasn't raised. But to the extent your office provides advice to law enforcement, this might be something worth mentioning. I do. I understand how it could play certainly into a Miranda argument. But I think on the police's side in this case is to point out how forthright they went. Because a striking feature of Davis is the Supreme Court saying, you don't have an obligation to clarify. You actually don't. We'd like you to, but we're not saying that that's a constitutional imperative. And yet these officers went very far down that road to try to figure out what this individual wanted to do at this time. And I think that is to their credit. So as I look at the case, I see that reinitiation happened. There's no unambiguous assertion of the right to counsel. And then the question comes down to the Miranda is the signing of the waiver of voluntary intelligence. The argument is made that the statement by the officers that typically if you invoke counsel, there isn't going to be an interview was coercive. I would disagree with that. I think the analogy that I've drawn is in the Fourth Amendment consent context, where someone says, well, what happens if I'm not going to agree to this consent? Well, we're going to go seek a warrant from a judge, and if we get it, we'll search it anyway. And this court has held that that's not coercive. It's truthful. It's providing information about what will or will not happen. And even though that may be not the information the defendant wants, it doesn't coerce him to give him a true statement about what the circumstances are. It would certainly put law enforcement in a bind if a true statement like that was thought to be coercive. Correct. And there was discussion below with the defendant's lawyer about whether that statement was in fact true. The defense lawyer acknowledged that that was reflected in real practice. So you have an experienced criminal defendant who had invoked Miranda only 40 minutes before, saw how it worked, was given plenty of time to think about his decision, and decided to waive. And maybe that was a bad choice in retrospect, but that's the choice that he made, was knowing intelligent involuntary. If the court doesn't have any further questions, I'm content to rest on the brief. Thank you. If I just might pick up really briefly on the voluntariness issue, which I didn't really reach in my addition, which you just concluded on. I think this court is, well, I think and I cite cases in my brief for the proposition that this denial of a phone call does affect the voluntariness analysis. I cite three cases in my brief. One is Harvey v. United States from the District of New Hampshire that says, depending on the totality of the circumstances, the denial of a phone call could render a situation sufficiently coercive that the defendant's consent was not voluntary. United States v. Schaeffer, which is an Eastern District of New York case, holding that while there's no constitutional right to a phone call, such a constitutional right can be implicated if it relates to other constitutional rights, such as the specific invocation of counsel and requests to be able to call them. And the other case, I think, that supports it is actually a case of Judge Selyus from the District of Rhode Island, United States v. Chaptolane, which is at 616 F. Supp 522. In the totality of the circumstances, I would suggest also that the refusal, although it hadn't been promised to provide a phone call, is just one of many issues that go to the voluntariness. The other is the length of the interrogation and its incommunicado nature because of the denial of access to counsel. At the time that the waiver was signed, more than six hours had elapsed. What time of day was this? Did the six hours take place? It was morning into the afternoon. I believe the second waiver was signed at like 3 p.m. So I have to double-check, but it was the middle of the day, not the middle of the night. And they didn't give him any lunch? They did not give him any lunch. And he actually told them during his initial interrogation that he had not eaten for quite some time. Go ahead. Just the point, I think that this more than six hours delay is additionally relevant because it is the same amount of time which would have triggered, if this had been a federal investigation, the prompt presentment requirement and would have raised an inference of coercion based on the length of detention without arraignment alone. Thank you. Thank you.